```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
```

| | |
|---|---|
| Joshua Young, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|   v. | ) No. 17 C 4803 |
| | ) |
| City of Chicago, et al., | ) |
| | ) |
|       Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

In this action, Joshua Young sues defendants the City of Chicago and Chicago police officers under 42 U.S.C. § 1983 and several state law theories in connection with his 2015 arrest, detention, and ensuing prosecution. After Young voluntarily dismissed two counts of the complaint,[1] the following counts remain:

    II. § 1983 – Unlawful detention under the Fourth Amendment

    IV. § 1983 – Deprivation of Due Process

    V. § 1983 – Failure to intervene

    VI. § 1983 – Conspiracy to deprive constitutional rights

    VII. Malicious prosecution under Illinois Law

    VIII. Civil conspiracy under Illinois Law

    IX. *Respondeat Superior* against the City

    X. Indemnification against the City

---

[1] Young voluntarily dismissed his claims for false arrest, Count I, and unlawful search and seizure, Count III. Dkt. No. 44.

1

Defendants seek summary judgment. Dkt. No. 51. For the reasons that follow, their motion is granted.

I.

The facts are set forth as favorably to Young, the non-moving party, as permitted by the record and Local Rule 56.1. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

On July 2, 2015, around 11:30am, Young took his childhood friend Corey Hughes to get a haircut in Chicago. Hughes had been shot the week before and was on crutches. As Young drove to the barbershop, Hughes told Young he had a gun. Young had never seen Hughes possess or talk about possessing a firearm before then. Young started to turn the car around and told Hughes he needed to take the gun back. Hughes said the person who gave him the gun was at the barbershop and he would return it to him there. At the barbershop, Young greeted a few people, then left, without Hughes, to visit his son. After several hours, Young returned to the barbershop to pick Hughes up. Young did not ask Hughes if he had gotten rid of the gun.

That same day, defendant City of Chicago police officers Anthony Pavone, Robert Peraino, and Nathaniel Warner (the "defendant officers") were conducting a street stop for a drug transaction they had witnessed. At some point during this stop, Warner received information from an anonymous citizen or confidential informant that Young and Hughes had been seen

2

nearby in a white Chevy sedan with a gun. Warner told Pavone and Peraino that there were "two male blacks" in a white Chevy with a gun and provided a location and direction of travel. Dkt. No. 53-4, Peraino Dep. at 30:8–17. Pavone and Peraino left to search for the car.

## A. Stop and Arrest

Pavone and Peraino soon found a white Chevy sedan and observed the rear-seat passenger was not wearing a seatbelt, a traffic violation. Pavone and Peraino approached the car with guns drawn and yelled "freeze" and "let me see your hands." Dkt. No. 53-5, Young Dep. at 72:2–8. As the officers approached, Hughes, sitting in the rear seat, told Young "take this." *Id*. at 72:6–22. Young, sitting in the driver seat, saw Hughes was wiping a gun on his shirt. Young had never handled or owned a firearm; he responded "hell no." *Id*. at 68:10–12. Young put his hands up, and Hughes placed the gun on the car's armrest. Young felt the gun poke him for a few seconds. Pavone and Peraino contend that they did not see any occupants moving while they approached.

Pavone ordered Young to exit the vehicle and he complied. Pavone maintains that Young then told him there was a gun in the car. Young maintains he denied having a gun when Pavone asked. The officers soon noticed a gun on the center console of the car and asked Young about the gun. Young responded the gun was not

3

his and it belonged to Hughes. Pavone denies that Young ever said the gun was Hughes's.

Hughes and Young were arrested around 6:45pm. They were then taken to the 15th District, placed in separate interview rooms, and advised of their Miranda rights. At some point, the defendant officers learned Young and Hughes were convicted felons. Warner and Peraino knew Hughes was a high-ranking member of the Mafia Insane Vice Lords, but none of the defendant officers had heard of or met Young before that day.

Hughes was interrogated first and told the officers that the gun was the "block's gun." Dkt. No. 62 at ¶ 32. Hughes argued he could not have carried the gun as he was wearing sweatpants and on crutches and stated that Young better have a gun on him because Hughes had recently been shot. At some point, one of the officers accompanied Hughes to the hospital because his gunshot wound needed cleaning.

Young was interrogated next. He repeatedly told the officers that the gun was not his. He testified that Warner told him that Hughes said the gun was his and he responded that was not true. According to Young, Warner then showed him a cell-phone video of Hughes in which Hughes claimed that he didn't know the gun was in the car or that Young had the gun. Defendant officers deny there was ever a video taken of Hughes and that Young was ever shown such a video. Young also testified that

4

Warner told him he knew the gun belonged to Hughes and that Young would be released and could go home in a few hours. Warner denies he said as much.

Defendant officers also prepared various police reports, which all list Hughes as the possessor and owner of the gun recovered from the white Chevy. Warner testified that the reports only allowed officers to list one owner and possessor of a gun, and he could have listed Young instead. However, Officer Pavone did not know why Hughes, rather than Young, was listed as the gun's owner on the reports.

Warner then called the State's Attorney's office. Assistant State's Attorney Liam Reardon returned the call and Warner told him what Hughes and Young had said. Reardon suggested that Warner obtain written statements from Hughes and Young if they were willing. Hughes, then at West Suburban Hospital, made the following written statement:

> I Corey Hughes is giving this statement on July 2, 2015 without coerced. I did not handled the firearm on this day but did in the past month. As a result my prints may be on the firearm.

Dkt. No. 62 at ¶ 64.

Young also agreed to provide a written statement. Young wrote that he picked up Hughes, Hughes said he had a gun but would drop it off at the barbershop, Young dropped off Hughes at

5

the barbershop, left, then returned to pick Hughes up. Young also wrote the gun was not his.

Young testified that Warner read his statement, told him there was information he could leave out, crumpled the statement into a ball, provided Young another sheet of paper, and told him to write another statement. Warner then instructed Young to write that he was not being coerced, then asked Young questions and instructed Young to write out the answers to those questions on the statement. Young also testified that Pavone and Peraino were present for Warner's actions, read Young's second statement, and agreed on it. Defendant officers deny all three of them were present, that Young wrote more than one statement, that his first statement was rejected by Warner, that Warner coached Young about what to include on the second statement, and that they agreed to any of Young's statements. The parties, however, agree that Young's second (or, rather, only) statement reads:

> I'm giving this statement of my own free will. Without being coercesed (sic). On 7/2/2015 at around 2:00p.m. I picked up Corey Hughes at Chicago Ave. and Waller. Then I helped him into the vehicle to go to the Barber Shop. After driving around for a while we pulled up to the Barbershop. He stated that "I got the Pipe on me." After leaving the Barbershop, we was driving on Cicero, I turned into the gas station on Adams and was approached by law enforcement. They instructed us to show our hands upon raising my hands I felt a poke in my back. I slightly turn while simultaneously raising my hands I felt a poke in my backside. There was a gun. The police ordered me out of the vehicle and ask

6

> if anything was in the vehicle. I said yes a gun. . .
> . When Corey stated "I got pipe" that's slang for
> handgun.

Dkt. No. 62 at ¶ 53.

Young maintains he was never told he could write what he wanted in the second statement and was not given the opportunity to add what he believed were important facts, namely that he did not know Hughes initially had a gun, he believed Hughes left that gun at the barbershop, he did not know Hughes still had a gun when he picked Hughes up, and did not learn Hughes still had that gun until he was pulled over. Defendants dispute this and claim that Warner merely told Young to write about his day before he was stopped. In either event, Young admitted that everything contained in that statement was true. Young, however, admitted that the video of Hughes he was shown did not influence him to make a written statement or the content of that statement.

## B. Legal Proceedings

Warner then relayed Hughes and Young's written statements to the felony review department of the State's Attorney's office, which approved felony charges for unlawful use of a weapon and armed habitual criminal offenses. Generally, the State's Attorney's office will rely on the information provided by police to determine whether to approve felony charges and defendant officers knew the information they provided would be

7

used to criminally prosecute Young. Peraino signed criminal complaints for those charges.

On July 9, 2015, Young had a preliminary hearing in front of Judge Ann O'Donnell in the Circuit Court of Cook County, Illinois. Peraino testified that Young stated Hughes told him he had a handgun on the way to the barbershop, and that after the barbershop, he was stopped by police and felt a poke in his back, he was ordered out of the vehicle, and a handgun was recovered from the vehicle. Peraino also testified that Hughes stated that Young better have a gun on him because he had been shot at and that Hughes said he did not handle the gun on that day. Judge O'Donnell found probable cause was established for both Young and Hughes.

Young received a $100,000 bond at his bond hearing. He could not pay it and was held in jail for over a year while he awaited trial. At trial, the prosecution dropped the unlawful use of a weapon charge and proceeded solely on the armed habitual criminal charge. Young's written statement was not used as evidence. Young and Hughes were found not guilty.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the

district court of the basis for its motion . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012) (citations omitted).

## A. Unlawful Detention

Defendants argue that summary judgment is warranted on Young's unlawful detention claim because the undisputed evidence establishes that the defendant officers had probable cause to arrest and detain Young. Specifically, Defendants point to i) the tip Warner received, ii) officers Pavone and Peraino finding a gun on the center console of the car Young was driving, iii) Pavone and Peraino's testimony that they did not see Hughes place the gun there, iv) Young's written statement that Hughes told him he had a gun in the car, and v) Hughes's statement that he did not handle the gun on the day he was arrested. Young responds that defendants overlook the core constitutional wrong he complains of: the use of "false information" to initiate criminal proceedings against him. Dkt. No. 61, Resp. Br. at 8. He also responds that there are factual disputes about how police collected his and Hughes's statements, who provided the tip Warner received, whether the arresting officers saw Hughes

9

with the gun as they approached the car, and whether police reports undermine the conclusion that Young possessed the gun.

The Fourth Amendment prohibits unreasonable searches and seizures and is effective against the states through the Fourteenth Amendment. U.S. Const. Amd. IV, XIV. A seizure, including pretrial detention, is reasonable only if based on probable cause to believe the detainee has committed a crime. *Manuel v. City of Joliet, Ill.* ("*Manuel I*"), 137 S. Ct. 911, 919–20 (2017). "[P]robable cause is a common-sense inquiry requiring only a probability of criminal activity[.]" *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citations omitted). "Probable cause is assessed objectively" based on the information known to officers and the conclusions that might reasonably be drawn from that information. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). To determine whether probable cause existed, I may consider the officers' collective knowledge of facts. *See United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018).

The undisputed facts demonstrate the defendant officers had probable cause to initiate criminal proceedings against Young. There is no dispute that Hughes told Young he had a gun, the arresting officers found a gun on the center console of the car Young was driving, the only other occupant of that vehicle, Hughes, stated that he did not handle the gun that day, and

Young had prior felony convictions. On these facts, a reasonable officer would reasonably believe that Young had committed the offenses of unlawful use of a weapon by a convicted felon and being an armed habitual criminal. *See* 720 ILCS 5/24-1.1(a) ("It is unlawful for a person to knowingly possess . . . any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction.") *and* 720 ILCS 5/24-1.7 ("A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of" certain enumerated offenses).

The fatal flaw in Young's arguments is that a jury could not reasonably find that the purported false statements and factual disputes that Young points to would make the defendant officers' probable cause determination unreasonable. The false information Young complains of is his second written statement, which the officers relayed to the State's Attorney's office for charging approval. Young admits that all the facts in that statement are true. But he contends the omissions in that statement created a "false impression" that he had knowledge that a gun was in the car when he was pulled over. Dkt. No. 61, Resp. Br. 7. According to Young, that statement omitted the facts that he picked up Hughes for two trips and believed Hughes

11

had disposed of the gun in between those two trips. In essence, Young is arguing that a jury could reasonably conclude that his omitted statements negate the other evidence establishing probable cause because they indicate he did not know Hughes still had a gun when he was pulled over. I disagree. The officers had no obligation to resolve the issue of whether Young knew of the gun found next to his seat in the car he was driving. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (Once an officer has established probable cause, "he need not continue investigating in order to test the suspect's claim of innocence.") (citation omitted).

None of the other factual disputes Young points to create a triable issue over whether the defendant officers had probable cause to initiate proceedings against him. Young challenges the use of his and Hughes's statements as a basis for probable cause because the officers allegedly made and destroyed a video recording of Hughes. Young argues this "establishes that Defendants are willing to play fast and loose with the taking and preserving of statements given by suspects and have no qualms about doing whatever it takes to get suspects charged." Dkt. No. 61, Resp. Br. at 8. Young, however, admits that this video had no impact on his decision to make a written statement or on the content he decided to include therein. As such, I cannot say that this video raises an issue as to whether the

officers had probable cause beyond the insinuation that they engaged in generalized misconduct. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (Speculation cannot "be used to manufacture a genuine issue of fact.").

Young also argues that foundational issues about Hughes' written statement make it "patently unreliable." Dkt. No. 61. Resp. Br. at 7-8. True, the officers' testimony and police reports do not present a clear record of which individual officer took Hughes's statement or how that statement was taken. That said, Young does not explain how the unreliability of this written statement would make the defendant officers' probable cause determination unreasonable, especially when Hughes's oral statements reiterate his denial that he possessed the gun.

Young also argues that there are fact issues over whether Warner received information from an "anonymous citizen" or a "confidential informant" and whether that person named Hughes and Young or "two male blacks." Dkt. No. 61, Resp. Br. at 5. Young contends that these issues show Warner is trying to "artificially enhance the presence of probable cause for the stop[.]" *Id*. However, even if Warner did so, it would not negate a later probable cause determination based on evidence collected at that stop. *Martin v. Marinez*, 934 F.3d 594, 599 (7th Cir. 2019) ("[T]he fact that the evidence was the fruit of an illegal detention does not make it any less relevant to establishing

13

probable cause for the arrest because the exclusionary rule does not apply in a civil suit under § 1983 against police officers.") (citations omitted).

Young asserts there is also a fact issue as to whether the officers saw Hughes with the gun as they approached the car. Young points to his testimony that Hughes placed the gun on the center console as police approached the car and the arresting officers' admission that they could see Hughes sitting against the rear window at the same time. Similarly, Young argues that police reports list Hughes, not him, as the owner of the firearm. These issues are not material to the question of whether there was probable cause to institute proceedings against Young because Illinois law recognizes that two individuals can be in joint possession of a firearm. *People v. Hill*, 589 N.E.2d 1087, 1089 (Ill. App. 3d Dist. 1992) ("The law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of others' access to the contraband.") (citations omitted). Evidence that Hughes handled or owned the gun would not make it unreasonable for the officers to conclude that Young had constructive possession of the gun found next to his seat in the car. *See Holmes*, 511 F.3d at 679 ("Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction.").

Summary judgment is granted on Count II.

### B. Due Process

Defendants argue that *Lewis* bars Young from proceeding on the theory that defendants violated his due process rights by fabricating evidence and withholding exculpatory evidence. Young concedes that he is not pursuing a claim that defendants withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Young, however, argues that *Lewis* should not bar his due process claim based on fabricated evidence because i) *Lewis* is inconsistent with *McDonough v. Smith,* 139 S. Ct. 2149 (2019), ii) *Lewis* is inconsistent with prior Seventh Circuit decisions, and iii) *Lewis* does not bar his claim that defendant officers corrupted the criminal process by "providing false information, reports, and testimony to prosecutors and the criminal court." Dkt. No. 61, Resp. Br. at 11.

Defendants are correct that Young cannot bring a due process claim for unlawful pretrial detention. *Manuel I* abrogated older Seventh Circuit precedent holding that pretrial detention after legal process started did not give rise to a Fourth Amendment claim but could constitute a due process claim if state law failed to provide an adequate remedy. *Manuel I*, 137 S. Ct. at 916 (citations omitted); *see, e.g., Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001). After *Manuel I*, the Seventh Circuit explained that all § 1983 claims for wrongful pretrial

detention sound in the Fourth Amendment. *Manuel v. City of Joliet* ("*Manuel II*"), 903 F.3d 667, 669-70 (7th Cir. 2018). Then, in *Lewis*, the Seventh Circuit applied these decisions to overrule its prior precedent in *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) to the extent it held the injury of wrongful pretrial detention may be remedied under § 1983 as a violation of the Due Process Clause. *Lewis*, 914 F.3d at 479.

*McDonough* does not limit *Lewis's* application to this case. In *McDonough*, the Court considered when the statute of limitations begins to run for evidence fabrication claims. 139 S. Ct. 2154-55. The Court noted that the Second Circuit interpreted the claim as arising under the Due Process Clause and assumed "without deciding that the Second Circuit's articulations of the right at issue and its contours are sound" as certiorari was not granted on those issues. *Id*. at 2155.

Nor does earlier Seventh Circuit law, explaining that the use of fabricated evidence to deprive a person of liberty is a due process violation, save Young's claim. *See Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015); *Saunders-El v. Rhode*, 778 F.3d 556, 560-61 (7th Cir. 2015); *Whitlock v. Brueggermann*, 682 F.3d 567, 580 (7th Cir. 2012). As the *Lewis* panel noted, prior decisions holding that pretrial detention based on police fabrications violates the Due Process Clause "cannot be reconciled" with *Manuel II*. 914 F.3d at 479.

Young's argument that he has a due process claim based on defendant officers' use of false evidence in his pretrial proceedings likewise fails. He contends that false evidence had a "real life effect on the bond court, preliminary hearing, and trial judge. . . ." Dkt. No. 61, Resp. Br. at 11. He does not specify which information was false and the only such effect he identifies is that his bond was set at an amount too high for him to pay. In other words, he complains he was detained due to false evidence. Consequently, Young's claim that false evidence tainted his pretrial proceedings sounds in the Fourth Amendment and fails for the same reasons as his unlawful detention claim.

Summary judgment is granted on Count IV.

### C. Malicious Prosecution

To prove malicious prosecution under Illinois law, Young must establish: "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez* v. *City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) (quoting *Sneed* v. *Rybicki*, 146 F.3d 478, 480–81 (7th Cir. 1998)). As Young has not mustered facts from which a jury could reasonably find the absence of probable cause, summary judgment is granted on Count VII.

## D. Conspiracy

As Young's other § 1983 claims fail, so does his § 1983 conspiracy claim because "conspiracy is not an independent basis of liability in § 1983 actions." *Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir. 2008). Likewise, Young's state law conspiracy claim fails because he has not marshalled evidence that "a combination of two or more persons for the purpose of accomplishing, through concerted action, either an illegal object or a legal object by an illegal means." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 843 (Ill. App. Ct. 1st Dist. 2000). Summary judgment is granted for Counts VI and VIII.

## C. Derivative Liability

To succeed on his failure to intervene claim, Young "must demonstrate that the [defendant officers] (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). As Young has not offered evidence that he suffered a constitutional violation, his failure to intervene claim fails.

The failure of Young's constitutional claims likewise dooms his claims against the City of Chicago. The City cannot be liable for indemnity or on the theory of *respondeat superior* as

the defendant officers are not liable for any underlying constitutional violation. *Gordon v. Degelmann,* 29 F.3d 295, 298 (7th Cir. 1994) ("You can't have vicarious liability without primary liability.").

Summary judgment is granted on Count V, IX, and X.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: November 27, 2019